**[J-54-2025]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 815 CAP |
| | : | |
| Appellee | : | Appeal from the Order entered on |
| | : | February 28, 2024, in the Court of |
| | : | Common Pleas, Delaware County, |
| v. | : | Criminal Division at No. CP-23-CR- |
| | : | 0004586-1994. |
| | : | |
| WAYNE A. SMITH, | : | SUBMITTED: May 9, 2025 |
| | : | |
| Appellant | : | |

**OPINION**

**JUSTICE BROBSON**                                    **DECIDED: February 26, 2026**

This is a direct appeal from an order dismissing a petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa. C.S. §§ 9541-9546. Appellant Wayne Smith (Smith), who is sentenced to death, argues that the Court of Common Pleas of Delaware County (PCRA court) erred by rejecting his multiple claims of ineffective assistance of counsel.[1] We agree with Smith that the PCRA court improperly dismissed his claim that his counsel was ineffective during a resentencing hearing for failing to object adequately to evidence introduced by the Commonwealth that Smith read books on murder and aspired to be a serial killer. Consequently, we reverse the PCRA court's order and remand the matter for a new penalty-phase hearing.

---

[1] A final order under the PCRA, in a case in which the death penalty has been imposed, is directly appealable to this Court. 42 Pa. C.S. § 9546(d).

# I. FACTUAL AND PROCEDURAL HISTORY

This Court previously summarized the background underlying this matter as follows:

> On November 18, 1994, Eileen Jones [(Jones)] and [Smith] went to [Smith's] nephew to borrow a car; the nephew gave him the keys, and [Smith] and Jones left together in the car. [Smith] returned the car later that evening.
>
> The next afternoon, [Smith] told his brother he murdered Jones in a nearby park by choking her with his hands and belt. Jones'[] body was discovered November 22, 1994; the county medical examiner concluded the death was homicide by strangulation. After a search of [Smith's] home, police officers recovered several newspapers from which articles regarding the recovery of Jones'[] body had been removed.
>
> [Smith] was given *Miranda*[1] warnings and waived his rights. He stated he borrowed his nephew's car to purchase drugs, and Jones agreed to have sex with him in exchange for the drugs. [Smith] and Jones went to a park, and [Smith] attempted to have sex with her. [Smith] stated he choked Jones to death because he was concerned she would accuse him of rape. He disposed of her body in a nearby creek.
>
> [1] *Miranda v. Arizona*, 384 U.S. 436 . . . (1966).
>
> A jury found [Smith] guilty of first-degree murder and sentenced him to death. [Smith] appealed, and this Court affirmed the conviction and the sentence. *Commonwealth v. Smith*, 694 A.2d 1086, 1096 (Pa. 1997) [(*Smith I*)]. [Smith] then filed a *pro se* petition under the [PCRA], and counsel was appointed. Following a hearing, the PCRA court denied the petition. We affirmed the denial of guilt-phase relief[] but vacated the death sentence and remanded for a new penalty-phase hearing on the grounds that counsel provided ineffective assistance. *Commonwealth v. Smith*, 995 A.2d 1143, 1173 (Pa. 2010) [(*Smith II*)]. At that 2012 penalty-phase hearing, a jury sentenced [Smith] to death after finding the aggravating circumstance of a prior voluntary-manslaughter conviction,[2] 42 Pa. C.S. § 9711(d)(12), outweighed the mitigating circumstances of [Smith's] emotional distress, *id.*[] § 9711(e)(2), and abusive childhood, *id.*[] § 9711(e)(8). [Notably, the jury also concluded that: (1) the Commonwealth failed to prove the aggravating circumstance found at Section 9711(d)(6) of the Sentencing Code, 42 Pa. C.S. § 9711(d)(6), *i.e.*, that "[t]he defendant committed [the] killing while in the perpetration of a felony;" and (2) Smith did not establish the mitigating circumstance found at Section 9711(e)(3) of the Sentencing Code, 42 Pa. C.S. § 9711(e)(3), *i.e.*, "[t]he capacity of the

defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired."]

> [2] [Smith] was convicted of voluntary manslaughter in 1980 for the stabbing death of his [ex]-girlfriend's brother.

*Commonwealth v. Smith*, 131 A.3d 467, 469-70 (Pa. 2015) (*Smith III*).[2] This Court subsequently affirmed Smith's sentence. *Id.* On October 3, 2016, the United States Supreme Court denied Smith's petition for a writ of certiorari. *Smith v. Pennsylvania*, 580 U.S. 830 (2016).

On June 6, 2017, Smith, acting *pro se*, timely filed his first PCRA petition following his resentencing hearing. The PCRA court appointed counsel to represent Smith, and counsel subsequently filed an amended PCRA petition. The amended petition challenged the stewardship of Smith's trial counsel, initial appellate counsel, and resentencing counsel. The Commonwealth filed an answer to the petition.

On June 6, 2019, the PCRA court entered an order: (1) granting Smith leave to supplement his petition to enhance several of his claims; (2) granting Smith an evidentiary hearing to litigate some of his claims regarding resentencing counsel; and (3) providing notice of the court's intent to dismiss a variety of Smith's claims without exploring them in an evidentiary hearing. Smith then filed a second amended PCRA petition in response to the PCRA court's invitation to supplement his amended petition. The Commonwealth responded to the second amended PCRA petition.

On May 14, 2021, the PCRA court, per Judge James Bradley (Judge Bradley), held an evidentiary hearing. In August of 2021, however, the parties filed a joint motion seeking Judge Bradley's recusal. Judge Bradley granted the motion, and the matter was assigned to Judge Mary Alice Brennan (Judge Brennan). Judge Brennan held another evidentiary hearing on June 5, 2023. On February 28, 2024, Judge Brennan issued a

---

[2] Relevant to this matter, Section 9711 of the Sentencing Code, 42 Pa. C.S. § 9711, sets forth the sentencing procedures for first-degree murder.

memorandum and order dismissing Smith's PCRA petition. Smith timely filed a notice of appeal. The PCRA court directed Smith to file a statement pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), and Smith complied. The PCRA court subsequently authored an opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

## II. GENERAL PRINCIPLES OF LAW

This Court has explained the standard for reviewing PCRA court orders denying relief as follows:

> [W]e must determine whether the findings of the PCRA court are supported by the record and whether the court's legal conclusions are free from error. The findings of the PCRA court and the evidence of record are viewed in a light most favorable to the prevailing party. The PCRA court's credibility determinations, when supported by the record, are binding; however, this [C]ourt applies a *de novo* standard of review to the PCRA court's legal conclusions. We must keep in mind that the petitioner has the burden of persuading this Court that the PCRA court erred and that such error requires relief. Finally, this Court may affirm a valid judgment or order for any reason appearing of record.

*Commonwealth v. Montalvo*, 205 A.3d 274, 286 (Pa. 2019) (citations omitted).

All of Smith's appellate issues concern the alleged ineffective assistance of resentencing counsel.

> It is well-settled that counsel is presumed to have been effective and that the petitioner bears the burden of proving counsel's alleged ineffectiveness. *Commonwealth v. Cooper*, . . . 941 A.2d 655, 664 ([Pa.] 2007). To overcome this presumption, a petitioner must establish that: (1) the underlying substantive claim has arguable merit; (2) counsel did not have a reasonable basis for his or her act or omission; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance, "that is, a reasonable probability that but for counsel's act or omission, the outcome of the proceeding would have been different." *Id.* A PCRA petitioner must address each of these prongs on appeal. *See Commonwealth v. Natividad*, . . . 938 A.2d 310, 322 ([Pa.] 2007) (explaining that "appellants continue to bear the burden of pleading and proving each [prong of the ineffective-assistance-of-counsel standard] on appeal to this Court"). A petitioner's failure to satisfy any prong of this test is fatal to the claim. *Cooper*, 941 A.2d at 664.

*Commonwealth v. Wholaver*, 177 A.3d 136, 144 (Pa. 2018).

## III. ISSUE

**"Was resentencing counsel ineffective for failing to adequately object to and challenge the Commonwealth's evidence and argument portraying Appellant as a serial killer?"**[3]  (Smith's Brief at 2.)

## IV. DISCUSSION

### A. Introduction

Prior to his initial trial, Smith filed a motion in limine.  In that motion, Smith reported that the "affidavit of probable cause attached to the criminal complaint alleges that [Smith] advised his brother, Jeffrey Smith [(Jeffrey)], that he[, *i.e.*, Smith,] believes he is a serial killer, and fantasied (*sic*) about being a serial killer."  (Motion in Limine, 4/24/1995.)  Smith argued that the "lack of probative value of any mention of 'serial killer' combined with the extreme prejudice to [Smith] requires that no mention of the allegation be made to the jury or news media from whom the jury may learn of the allegations."  (*Id.*)  We were unable to locate an order ruling on that motion, though the PCRA court's docket reflects that the trial court entered an order granting a motion in limine on May 5, 1995.[4]

Of further relevance to the instant matter, as noted above, Smith was convicted of voluntary manslaughter in 1980.  This conviction stemmed from Smith stabbing to death George Sutton (Sutton), who was the brother of Smith's ex-girlfriend, Sonya Rollins (Rollins).  Rollins witnessed Smith kill Sutton with a machete.  The manslaughter

---

[3] Because the resolution of this issue provides Smith with relief, we need not address his other issues.

[4] The certified record's "content list" suggests that the May 5, 1995 order is Number 21 of the certified record.  Number 21 of the certified record, however, is an order requiring the Commonwealth to show cause why Smith's motion in limine should not be granted.  Of further note, Smith represents in his brief to this Court that the May 5, 1995 order granted the motion in limine that he filed on April 24, 1995.  (Smith's Brief at 45; *see id.* ("Notably, the defense had successfully precluded the Commonwealth from pursuing this same theory[, *i.e.*, the serial-killer theory,] during [Smith's] initial trial and sentencing in 1995.").)  The Commonwealth does not contest this representation.

conviction was the predicate for the sole aggravating circumstance that the Commonwealth proved at Smith's 2012 resentencing hearing. *See* 42 Pa. C.S. § 9711(d)(12) (explaining that aggravating circumstances include defendant being convicted of voluntary manslaughter as defined in 18 Pa. C.S. § 2503).

Prior to Smith's resentencing hearing, the Commonwealth initially asked the resentencing court to allow the prosecution to present Rollins' testimony to prove the facts and circumstances underlying the 1980 killing of Sutton for purposes of an aggravating circumstance under Section 9711(d)(12) of the Sentencing Code. (Notes of Transcript (N.T.), 6/15/2012, Vol. II, at 386-407.) The Commonwealth, however, also asserted that Rollins informed the prosecution that, "in the three months she was dating [Smith,] she knew that he tended to read books." (*Id.* at 389.) The Commonwealth stated that, according to Rollins, Smith read "The Perfect Crime" and "How to Get Away with the Perfect Crime." (*Id.* at 390.) Rollins also reported to the Commonwealth that Smith "read every murder book he could get his hands on," (*id.*), and that Smith's "room was filled with these books," (*id.* at 391).

The Commonwealth asserted that its reasons for wanting to present the reading-material evidence was two-fold. The prosecutor explained:

> Number one, I'm committed to putting evidence of the crime that [Smith] is alleged to have committed. And that crime is a first degree, premeditated murder. And it's my position that his premeditation and his intent to commit murder goes back to 1980 when he was reading these books. And continued from 1980 to 1994. At the time he was reading these books, Your Honor, he was reading how to commit the perfect crime and how to get away with the perfect crime.

(*Id.*)

The Commonwealth further noted that, after Smith killed Jones, Smith's brother, Jeffrey, informed police that Smith read "books on serial killers, specifically Ted Bundy." (*Id.* at 391-92.) The Commonwealth added that, on the night that Smith was arrested, he

told "the police that he fantasized about being a serial killer" and that "he always wondered what that attention and recognition would feel like." (*Id.* at 391-92.) The prosecutor suggested that, "taking all of those statements in conjunction, that that [(*sic*)] goes to his intent to commit a crime against . . . Jones. And I'm permitted to put on evidence of intent under [Pennsylvania Rule of Evidence] 404(b)." (*Id.* at 392; *see id.* at 393 ("That is my first position here, Your Honor[,] that his actions from 1984 [(*sic*)] go to the intent that he forms in killing . . . Jones.").)

As to the Commonwealth's second reason for wanting to present the reading-material evidence to the jury, the prosecutor initially highlighted that Smith was planning to present mitigation evidence to demonstrate that he "was not able to conform his actions to the law in that he was suffering from a cocaine induced psychosis . . . [and] extreme mental disturbances," *i.e.*, post traumatic stress disorder. (*Id.* at 394.) The prosecutor maintained that the reading-material evidence suggests that Smith was planning to murder Jones for 14 years and that such a fact "certainly rebuts" any claim that Smith killed Jones because he was in a "cocaine induced psychosis." (*Id.*) In addition, the Commonwealth stated that Smith intended to introduce evidence that he committed these actions because "he had a poor childhood, had an abusive home, and his family abused him[,] and he therefore was not able to conform his conduct." (*Id.*) The Commonwealth contended that the reading-material evidence "certainly rebuts" Smith's claim that his abusive childhood contributed to him killing Jones, "because [Smith is] saying [that] at the time that [he] strangled . . . Jones[,] he was suffering from an extreme disturbance." (*Id.* at 395; *see id.* ("So again, planning something for 14 years, and fantasizing about doing it rebuts the defense of post traumatic stress disorder.").) Notably, the Commonwealth conceded that the cases upon which it relied regarding the admissibility of the reading-material evidence "allowed this evidence at trial."

(*Id.* at 395-96.) In other words, the cases did not address the admissibility of evidence at a sentencing hearing.

In response, resentencing counsel initially informed the resentencing court that he was not prepared to address the admissibility of evidence regarding the facts and circumstances underlying the 1980 homicide, as the Commonwealth only recently informed him that it intended to present that evidence at the resentencing hearing. Resentencing counsel nevertheless argued that the "facts and circumstances regarding the 1980 homicide aren't admissible in a sentencing hearing." (*Id.* at 397.) Resentencing counsel pointed out that, in 1980, Smith pled guilty to voluntary manslaughter and that Rollins' proffered testimony suggested that Smith was convicted of first-degree murder. Resentencing counsel added:

> I haven't heard, you know, from any doctor that reading these books impacts a finding of anything. I haven't heard that [(*sic*)] the Commonwealth's experts yet. So I'm wondering–I'm wondering about the relevance at this point. As far as planning, Judge, when you–[Smith's] mental state is not at issue in either one of those two crimes. It's–he's already been convicted. Whether he acted with specific intent, whether he knew what he was doing was already decided by a jury in the second case. So while theoretically and in a vacuum it may be admissible to admit the fact that he was reading books, what the Commonwealth seeks to prove is not at issue. So, all we are talking about is smearing his character. Look what he's doing. He's reading these books on murder, he must be a really bad guy. That's all that–that's all that can be proven.

(*Id.* at 398-99.) In rebuttal, the Commonwealth reiterated its position that the prosecution was permitted to inform the jury of the facts and circumstances underlying the 1980 homicide. The resentencing court reserved its ruling on the Commonwealth's request.

Immediately before the resentencing hearing commenced, the Commonwealth notified the resentencing court that Smith had filed a counter motion seeking to limit the Commonwealth to presenting actual documentation regarding Smith's conviction for

voluntary manslaughter. (N.T., 6/18/2012, Vol. I, at 4-5.) The parties then offered brief arguments as to their positions concerning whether the Commonwealth should be permitted to present Rollins' testimony to provide a background to the 1980 manslaughter conviction. The resentencing court ruled that this evidence was admissible. The prosecutor then reminded the resentencing court that she had presented a "second motion in limine . . . as it relates to the books that . . . Rollins indicated that she knew [Smith] to be in possession of and read." (*Id.* at 9.) The resentencing court responded: "Okay. The [c]ourt is going to permit that." (*Id.*)

In sum, the resentencing court ruled that the Commonwealth could present Rollins' testimony: (1) regarding the facts and circumstances underlying the 1980 manslaughter conviction; and (2) that Smith owned and read books on crime and murder. The Commonwealth, however, did not ask the resentencing court to allow the prosecutor to question any other witness concerning Smith's preferred reading material or to permit the prosecutor to question any witness regarding Smith's alleged desire to be a serial killer. Consequently, the resentencing court did not rule on those issues.

Relevant to the issue presently before this Court, at the resentencing hearing, the Commonwealth asked Rollins, *inter alia*, what type of books Smith kept in his room. (*Id.* at 40.) Rollins responded that Smith "would read murder mysteries, Perfect Crime, things like that." (*Id.*) Rollins further testified that Smith "had quite a few" of these books, and when asked again what type of books Smith "always used to read," Rollins stated that he read "murder books, crime books." (*Id.* at 41.) Moreover, while questioning Jeffrey, the Commonwealth asked him to read out loud a police report that indicated that Jeffrey told police that Smith had stated that he "had been thinking about becoming a serial killer" and that he "had been reading about killer Ted Bundy." (N.T., 6/18/2012, Vol. II, at 204-05.) Jeffrey conceded that he made that statement to police. (*Id.* at 205.)

The Commonwealth also elicited testimony from a police detective, David Peifer (Detective Peifer), regarding the statement that Smith gave to police following his arrest for killing Jones. When the prosecutor asked Detective Peifer how Smith responded to a question as to whether he talked about a serial killer, the detective read the following from Smith's statement:

> I ain't never want to be. I read books and stuff like that on it and always wanted to know what it's like to actually be one. How can somebody actually go out there and do these things? And I said I wonder if I could ever do something like that to get the recognition and get, you know, get attention. You know, I said I wondered if I could do that. That's all it was, a fantasy.

(*Id.* at 289.) The detective further testified that Ted Bundy was a serial killer who strangled his victims. (*Id.* at 290.) The prosecutor brought up the topic of Smith's reading habits and alleged desire to be a serial killer at other points in the hearing, such as when she cross-examined one of Smith's expert witnesses, (*see, e.g.*, N.T., 6/19/2012, at 105 (asking expert witness whether she saw "the statements which [Smith] made to police that he fantasized about being a serial killer"), and when she questioned one of the Commonwealth's experts, (*see, e.g.*, N.T., 6/21/2012, Vol. II, at 242 (asking expert if he was aware that Smith "was reading books that dealt with the perfect crime and any murder novel he could get his hands on," and expert responding, "I think I saw that later in connection with—I forget where it was, but there was certainly the portion of his statement about the serial killer preoccupation or fantasy[, a]nd I remember reading something about—about his having been reading books and thinking about it")).

Of further note, during her opening argument to the jury, the prosecutor stated, *inter alia*:

> Ladies and [g]entlemen, you will hear that in 1980 when . . . Rollins was dating [Smith] his favorite books to read were Perfect Crime and every murder book he could get his hands on. And I'd ask you to keep that in mind as you listen to the testimony of what happened in this case. Because

I would submit to you, [l]adies and [g]entlemen, that he began planning this murder 14 years before he committed it. You will hear that when he talked to the police he told them he had a fantasy of being a serial killer. That was his fantasy. He wondered what it would be like to get all that attention and recognition. He wondered if he could do it. Ladies and [g]entlemen, [Smith] took . . . Jones' voice that night when he strangled her and murdered her. At the end of this hearing I'm going to ask you to use yours and go for the death penalty. Thank you.

(N.T., 6/18/2012, Vol. I, at 24-25.)[5]

In her closing argument to the jury, the prosecutor stated, *inter alia*:

And I submit to you, ladies and gentlemen, it's right there in black and white, what he said. "[Smith] stated he had been thinking about becoming a serial killer. [Smith] stated that he had been reading about the serial killer, Ted Bundy." Had, ladies and gentlemen. Past tense. He had been thinking about becoming a serial killer. So at the time that he strangles . . . Jones, he's thinking about Ted Bundy. You heard from [Detective Peifer] who Ted Bundy was. He strangled and then raped his victims. That's what he's reading, ladies and gentlemen. That's what he's looking up. Doesn't that tell you that he formed the intent of what he was going to do to . . . Jones that night long before he ever did it? He saw her as an easy target. Here's a drug addict. I can take her to this remote area, do what I want with her, put her in a creek. Three weeks after this murder, ladies and gentlemen, you heard what he had to say. It was a fantasy to him. "I always wanted to know what it's like to actually be one." That was what he said in response to his fantasy about being a serial killer. How can somebody actually go out there and do these things? "And I said, I wonder if I could ever do something

---

[5] In both his second amended PCRA petition and his appellate brief, Smith claims that, during her opening argument, the prosecutor stated that "going back 14 years [Smith] has [been] reading books on the subject [of being a serial killer] and studying up on it." According to Smith, that statement can be found on page 105 of the transcript for the resentencing proceeding that took place on June 19, 2012. (Second Amended PCRA Petition, 10/15/2019, at 35; Smith's Brief at 44.) We, however, highlight that the prosecutor gave her opening statement to the jury on June 18, 2012. (N.T., 6/18/2012, Vol. I, at 19-25.) At page 105 of the June 19th transcript, the prosecutor was cross-examining one of Smith's expert witnesses, when she asked the witness, "Okay. Well, how about this individual, ma'am, going back [14] years, has been reading books on the subject and studying up on it? Would that imply some thought?" (N.T., 6/19/2012, at 105.) The expert responded, "It does not imply anything adaptive. It implies maladaptivity and abnormality." (*Id.*)

like that to get the recognition and get, you know, get attention." Well, ladies and gentlemen, give him his recognition. Give him his attention.

(N.T., 6/22/2012, at 16-17.)

In Smith's direct appeal from his judgment of sentence imposed after his resentencing hearing, *i.e.*, in the appeal addressed by this Court in *Smith III*, Smith contended, *inter alia*, that the resentencing "court erred in admitting evidence of [the 1980 manslaughter] case, arguing he was prejudiced by the presentation of facts and circumstances behind that conviction." *Smith III*, 131 A.3d at 473. "Specifically, he claim[ed] the Commonwealth agreed at the time of conviction, presumably after thoroughly investigating the matter, that [v]oluntary [m]anslaughter was appropriate. To present evidence now that demonstrated a brutal, unprovoked and malicious killing, a crime much worse than that agreed to by the Commonwealth, is simply not fair." (*Id.* (some alterations in original) (citation and internal quotation marks omitted).) This Court rejected the claim, reasoning:

> The voluntary-manslaughter conviction was the basis for an aggravating circumstance being pursued by the Commonwealth under 42 Pa. C.S. § 9711(d)(12). As there are countless scenarios that could comprise this crime, the jury should know the facts behind the conviction to appropriately balance the (d)(12) aggravator against any mitigating circumstances; without the basic facts, the jury is short-changed. We find the [resentencing] court did not abuse its discretion by admitting this evidence.

*Id.* at 474.

Smith also argued in *Smith III* that the resentencing "court erred in allowing evidence that around the time of the 1980 homicide of . . . Sutton, [Smith] read certain books about homicide and how to commit the perfect crime." *Id.* (citation and internal quotation marks omitted). "Specifically, [Smith] assert[ed that] the evidence had no probative value and was extremely prejudicial." *Id.* (citation and internal quotation marks omitted). This Court in *Smith III* concluded that Smith waived this issue because he "did

not raise his objections at trial," *i.e.*, during the resentencing hearing. *Id.* In support, the Court reported that the "record reveal[ed that Smith] did not object when the [resentencing] court announced its ruling on the Commonwealth's motions in limine regarding this evidence. Further, no objections were made during the [resentencing] hearing when the Commonwealth introduced the evidence." *Id.* (citations omitted).

### B. Second Amended PCRA Petition

In his second amended PCRA petition, Smith asserted that resentencing counsel "was ineffective for failing to object to evidence used by the Commonwealth to portray [him] as a serial killer in training." (Second Amended PCRA Petition, 10/15/2019, at 35.) He cited the evidence that we detailed *supra*, as well as the prosecutor's opening and closing arguments to the jury. (*Id.* at 35-36.) Smith conceded that resentencing counsel "did oppose the Commonwealth's pretrial motion in limin[e] regarding the introduction of Rollins' testimony and evidence pertaining to [his] reading habits and purported serial killer tendencies." (*Id.* at 36.)

Smith, however, faulted resentencing counsel for failing "to pursue his objection when the [resentencing] court summarily granted the motion." (*Id.*) He added that "counsel failed to renew his objection to the evidence when Rollins took the stand, thereby failing to preserve the objection for appeal." (*Id.*) Smith further reported that resentencing counsel never challenged the admissibility of Jeffrey's testimony and that counsel "failed to object to the Commonwealth's repeated mischaracterization and inflammatory use of the evidence throughout resentencing proceedings." (*Id.*)

According to Smith, "[e]ach of these pieces of evidence was lacking in relevance and any probative value was grossly outweighed by the prejudice to [him]." (*Id.*) Smith submitted that "[r]esentencing counsel could have no reasonable strategy for not vigorously litigating the admissibility of the evidence." (*Id.*) In addition, he stated that,

"[h]aving made no meaningful attempt to exclude the evidence, resentencing counsel also failed to properly prepare his expert witness to respond to evidence or to otherwise rebut the significance assigned to it by the Commonwealth. [Resentencing] counsel was deficient in this regard[, and Smith] was prejudiced as a result." (*Id.*)

According to Smith, "[n]one of the 'serial[-]killer' evidence presented by the Commonwealth was relevant in [Smith's] resentencing proceedings." (*Id.* at 38.) In response to the Commonwealth's contention at the resentencing hearing that this evidence was admissible to prove Smith's intent, Smith suggested that, because he already had "been convicted of [first-degree murder], his state of mind was not at issue in the resentencing proceedings." (*Id.* at 39.) As to the Commonwealth's position that the evidence was admissible to rebut Smith's mitigation evidence regarding his mental illness, Smith averred that "[t]his argument is entirely specious as none of the experts['] opinions relied upon or were impacted by this evidence." (*Id.*)

### C. Commonwealth's Response

The Commonwealth emphasized that "resentencing counsel did object to the admission of evidence regarding [Smith's] interest in reading about serial killers and his objection was overruled." (Commonwealth's Response, 5/17/2019, at 34.) The Commonwealth, however, conceded that "[r]esentencing counsel . . . did not object to admission of the evidence after the [resentencing] court made its ruling on the Commonwealth's motion in limine to permit the admission of evidence to [Smith's] reading material and interest in serial killers." (*Id.*) After noting that the Court in *Smith III* concluded "that resentencing counsel had waived the issue concerning purported serial[-]killer[-]in[-]training evidence by not objecting at [the resentencing hearing]," the Commonwealth argued:

> Even if resentencing counsel had objected during the resentencing proceedings, the purported serial[-]killer[-]in[-]training evidence was:

(1) properly admitted, which means that counsel could not be deemed ineffective for failing to object; or (2) its admission was harmless error, which also means that counsel could not be deemed ineffective for failing to object to its admission.

(*Id.* at 35.)

## D. Evidentiary Hearing

The parties litigated Smith's claim throughout the evidentiary hearing that was held on May 14, 2021. The only evidence that Smith presented at the hearing was resentencing counsel's testimony. As to why resentencing counsel did not object to the reading-material or serial-killer evidence after the resentencing court ruled on the Commonwealth's motion in limine, the gist of counsel's testimony was that the court already had ruled that the evidence was admissible and that continuing to object to the evidence's admissibility would have been futile.

## E. PCRA Court's Opinion

The PCRA court disposed of this issue by explaining:

[Resentencing] counsel's choices regarding this evidence were reasonable. Resentencing counsel objected to the serial[-]killer testimony and evidence prior to [the resentencing hearing] and had been overruled. Furthermore, resentencing counsel had thoroughly researched the issue and was unable to find any case law in support of his position. He was not required to keep objecting and highlight the issue for the jury. Therefore, resentencing counsel's tactical decision not to continue objecting was reasonable. An attorney is not required to make every possible objection to be effective. Additionally, [Smith] has not established prejudice because he has not demonstrated that the outcome of the case would have been different if counsel had further objected to the "serial killer" evidence. Considering all the other evidence in the case, the "serial killer" evidence was only a small part of the Commonwealth's overall case. It is doubtful that the outcome of the case would not have been different if it were excluded. [Smith] has not shown that the outcome of the case would have been different considering the other evidence against him. He therefore has not established prejudice. Accordingly, this claim was dismissed after a hearing.

(PCRA Court Opinion, 5/20/2024, at 13.)

**F. Parties' Arguments on Appeal**

**1. Smith's Argument**

Smith continues to argue that the reading-material and serial-killer evidence were irrelevant for purposes of the 2012 resentencing hearing. (Smith's Brief at 46-47.) Regarding the PCRA court's opinion, Smith criticizes the court's conclusion that resentencing counsel acted reasonably by not continuing to object to the evidence at issue after the resentencing court granted the Commonwealth's motion in limine. In so doing, Smith emphasizes that "this Court found otherwise on direct appeal from the resentencing," where the Court concluded that Smith "had waived his claim that the [resentencing] court erred in admitting [Rollins'] testimony about the books because [Smith] 'did not object when the [resentencing] court announced its ruling on the Commonwealth's motions in limine regarding this evidence' and 'no objections were made during the [resentencing] hearing when the Commonwealth introduced the evidence.'" (*Id.* at 58 (quoting *Smith III*, 131 A.3d at 474).)

As to the PCRA court's determination that resentencing "counsel thoroughly researched the issue[, *i.e.*, the admissibility of the reading-material evidence,] and was unable to find any case law in support of his position," Smith posits that, "regardless of whether this case[ ]law justified the admission of [Rollins'] testimony describing [the 1980] killing as having been unprovoked and unjustified, . . . it does not support the admissibility of the serial[-]killer evidence, as there was no allegation that the 1980 voluntary manslaughter had itself been 'serial' to any other crime." (*Id.* (citation omitted).) Smith further suggests that,

> even if there were some overlap in [Rollins'] testimony on [Smith's] reading habits and the 1980 manslaughter conviction, case[ ]law regarding the admissibility of the facts and circumstances of a prior conviction could not possibly justify counsel's failure to object to the double-hearsay statement . . . recounting [Jeffrey's] purported statement about [Smith's] interest in serial killers or the relevant portion of [Smith's] own statement.

Nor could it justify counsel's failure to object to the prosecutor's frequent mischaracterization of the evidence and her inflammatory use of the serial-killer theory.

(*Id.* at 59.)

Concerning the PCRA court's analysis of the prejudice prong of the ineffective-assistance-of-counsel standard, Smith points out the court stated that he had "not demonstrated that the outcome of the case *would have been different* if counsel had further objected to the 'serial[-]killer' evidence." (*Id.* (emphasis in original) (quoting PCRA Court Opinion, 5/20/2024, at 13).) Smith argues that this standard is incorrect. According to Smith, "the court should have analyzed whether there was sufficient evidence to create a reasonable probability that the evidence would convince one juror to vote for life." (*Id.* (citing *Wiggins v. Smith*, 539 U.S. 510, 537 (2003)).) "Instead," Smith contends, "the PCRA court imposed an undue burden on [him] and, as a result, its conclusion is wrong." (*Id.*) Smith adds that the PCRA court incorrectly expressed that the reading-material and serial-killer evidence were only a small part of the Commonwealth's case. Smith insists that "the Commonwealth made this evidence the central theme of its case for death, emphasizing it in both opening and closing arguments and repeatedly returning to it throughout the proceedings." (*Id.* at 60.)

### 2. Commonwealth's Argument

The Commonwealth initially takes the position that the "[e]vidence related to the serial[-]killer argument was properly admitted as a fact and circumstance surrounding the 1980 homicide." (Commonwealth's Brief at 67.) In support, the Commonwealth explains that, "[u]nder *Commonwealth v. Beasley*, 479 A.2d 460 (Pa. 1984), in a penalty[-]phase hearing, evidence regarding the facts and circumstances surrounding the prior convictions which form the basis for an aggravating factor is relevant and is admissible." (*Id.* at 67-68.) Here, the Commonwealth submits, "[t]he facts and circumstances

surrounding [Smith's] 1980 homicide [conviction] include the fact that he was reading books on ways to commit the perfect murder or to commit the perfect crime, as well as [Smith's] statement to his brother that he was considering becoming a serial killer." (*Id.* at 68.)  In the Commonwealth's view, "[t]his evidence was relevant in that it was related to the nature of the prior offense and [Smith's] character." (*Id.*)

Turning to the reasonable basis prong of the ineffective-assistance-of-counsel standard, the Commonwealth emphasizes that "resentencing counsel did object to the Commonwealth's pretrial motion in limine to admit the testimony about [Smith] reading about serial killers." (*Id.* at 69.)  Noting that the resentencing court granted that motion, the Commonwealth argues that "[i]t was not unreasonable for resentencing counsel not to continue to object when he had already been overruled." (*Id.* (citing *Commonwealth v. Wright*, 961 A.2d 119, 153 (Pa. 2008)).)  The Commonwealth adds that "counsel's decision not to object further was reasonable because, as he testified, he researched the issue of the serial-killer evidence after the Commonwealth filed the motion in limine and discovered that '[c]ase law was not on [his] side.'" (*Id.* (quoting N.T., 5/14/2021, at 41-43).)  The Commonwealth points out that, during the May 14, 2021 evidentiary hearing, resentencing counsel "testified that he 'did not' find any case law to support the position that he argued—that the reading material was irrelevant and prejudicial as opposed to being part of the facts and circumstances of conviction." (*Id.* at 70 (citing N.T., 5/14/2021, at 43).)

Along the same lines, the Commonwealth explains that "an attorney is not required to make every possible objection to be effective." (*Id.*)  The Commonwealth argues that "[o]bjecting to the reading material and [Smith's] statement in front of the jury—as opposed to during the motion in limine in front of the court—would draw further attention to what was . . . a relatively minor point." (*Id.*)  According to the Commonwealth, "where

resentencing counsel had already objected prior to [the resentencing hearing] and been overruled, he was not required to keep objecting and highlight the issue for the jury." (*Id.* at 70-71.)

In addition, the Commonwealth argues that, "[e]ven if this Court finds that resentencing counsel was deficient for not objecting, [Smith] has not established prejudice." (*Id.* at 71.) Noting that Smith points out that his original trial counsel "had managed to have the [serial-killer] evidence precluded," the Commonwealth suggests that Smith's reliance "on the prior trial severely undercuts his assertion of prejudice: the first jury did not hear this evidence and still sentenced [Smith] to death." (*Id.* (emphasis omitted).) In the Commonwealth's view, Smith "cannot now say that he was prejudiced to the point that the jury would not have sentenced him to death if they had not heard this evidence." (*Id.*)

The Commonwealth then adds that "the properly admitted evidence was not so strong that, even if it was an abuse of discretion to admit it, prejudice would have resulted." (*Id.*) In this regard, the Commonwealth highlights, *inter alia*, Rollins' testimony that, prior to killing Sutton, Smith held a knife to her throat. The Commonwealth contends that, given Rollins' "direct, relevant, and unrebutted testimony about [Smith's] violent actions toward . . . Rollins on the night he killed her brother—[14] years before the instant murder—it cannot be said that the jury would have decided the case differently if only the serial[-]killer evidence had not been admitted." (*Id.* at 72.) The Commonwealth then reports that Smith's statement to Jeffrey "contained far more damaging statements than the reference to serial[-]killer material," such as Smith's description to Jeffery of how he killed Jones. (*Id.*) Lastly, the Commonwealth asserts that Smith "has not established that an appeal on the merits of the issue would have been successful." (*Id.* at 73.) The

Commonwealth shares that, "even if its admission was not proper, it was likely harmless error." (*Id.*)

### G. Analysis

#### 1. Arguable Merit

Smith's primary argument is that the reading-material and serial-killer evidence were irrelevant to his resentencing process. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "The [trial] court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. In this context, "'[u]nfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially."[6] Pa.R.E. 403 cmt.

---

[6] As to the appellate court standard for reviewing evidentiary decisions, we have explained:

> It is well-established that the admissibility of evidence is within the discretion of the trial court, and such rulings will not form the basis for appellate relief absent an abuse of discretion. Thus, [an appellate court] may reverse an evidentiary ruling only upon a showing that the trial court abused that discretion. A determination that a trial court abused its discretion in making an evidentiary ruling may not be made merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. Further, discretion is abused when the law is either overridden or misapplied.

*Commonwealth v. Hoover*, 107 A.3d 723, 729 (Pa. 2014) (citations and internal quotation marks omitted).

The ultimate issue before the jury at the resentencing hearing was whether to sentence Smith to death or life imprisonment. 42 Pa. C.S. § 9711(a)(1). To make that decision, the jury first was required to determine: (1) whether the Commonwealth proved beyond a reasonable doubt any aggravating circumstances; and (2) whether Smith proved any mitigating circumstances by a preponderance of the evidence. 42 Pa. C.S. § 9711(c)(1)(iii). Because the jury found one aggravating circumstance and two mitigating circumstances, they then had to consider whether the aggravating circumstance outweighed the mitigating circumstances. 42 Pa. C.S. § 9711(c)(1)(iv). To sentence Smith to death, the jury had to reach a unanimous decision that the aggravating circumstance outweighed the mitigating circumstances. *Id.*

First, we agree with Smith that his intent to kill Jones was not at issue during the resentencing hearing. To convict Smith of first-degree murder, the Commonwealth had to prove beyond a reasonable doubt, *inter alia*, that Smith "acted with [the] specific intent to kill." *Smith I*, 694 A.2d at 1088 (citing 18 Pa. C.S. § 2502(d)). A jury convicted Smith of the first-degree murder of Jones in 1995, and that conviction remains undisturbed. Consequently, Smith's intent to kill Jones has long been established, and that intent was not a fact of consequence in the resentencing proceedings. Pa.R.E. 401. Therefore, contrary to the Commonwealth's contention at the resentencing hearing that the reading-material evidence was admissible to prove Smith's intent in killing Jones, that intent was irrelevant to whether Smith should be sentenced to death or life imprisonment.

Next, we examine the second reason that the Commonwealth offered at the resentencing hearing regarding the admissibility of the reading-material evidence, namely, that the evidence would rebut Smith's mitigation evidence. In essence, the Commonwealth's argument was that this evidence either would convince the jury: (1) not to find any mitigating factor; or (2) to assign less weight to the mitigating factors when

weighing them against the aggravating circumstances. As noted above, Smith's mitigation evidence focused on his abusive childhood, his mental illness, and whether his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

As an initial matter, it is unclear how the fact that Smith read books about murder would undermine mitigation evidence that suggested that Smith: (1) was abused as a child; (2) suffered from post traumatic stress disorder; or (3) was substantially impaired from appreciating the criminality of his conduct or from conforming his conduct the requirements of law. Moreover, to the extent that this evidence had any probative value concerning the weight of these mitigating factors, we conclude that the evidence's probative value was outweighed by the danger of unfair prejudice. Pa.R.E. 403.

As we previously explained, the jury rejected Smith's attempt to prove the mitigating factor found in Section 9711(e)(3) of the Sentencing Code, and, because the jury found one aggravating circumstance and two mitigating circumstances, it was required to determine whether the aggravating circumstance outweighed the mitigating circumstances. The injection of the reading-material and serial-killer evidence into the resentencing hearing suggested to the jurors that they could consider this evidence: (1) in determining whether to find the Section 9711(e)(3) mitigator, and (2) when weighing the aggravating and mitigating circumstances. This evidence, at best, has minimal probative value relative to Smith's mitigation evidence or the weighing process and, instead, created "a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially."[7] Pa.R.E. 403 cmt. For

---

[7] We also reject the Commonwealth's current suggestion that the reading-material and serial-killer evidence were relevant to the facts and circumstances underlying Smith's 1980 conviction for voluntary manslaughter. Smith pled guilty to voluntary manslaughter, which required proof that he killed "an individual without lawful justification . . . if at the time of the killing he [was] acting under a sudden and intense passion resulting from (continued…)

these reasons, we conclude that Smith has demonstrated that the inadmissibility of this evidence has arguable merit.

## 2.  Reasonable Basis

For all intents and purposes, the PCRA court held, and the Commonwealth argues, that, because resentencing counsel objected to the Commonwealth's motion in limine relative to the admissibility of Rollins' testimony about Smith's reading material, counsel acted reasonably by not further objecting to the reading-material and serial-killer evidence.  This position ignores two important factors.  First, the Court in *Smith III* clearly determined that resentencing counsel failed to object properly to the admission of Rollins' testimony as it related to the reading-material evidence and, therefore, waived any issue regarding that evidence.  *Smith III*, 131 A.3d at 474.

Second, in presenting its motion in limine, the Commonwealth did not request a ruling as to whether the prosecutor could ask any witness about Smith's desire to be a serial killer, and the trial court, therefore, made no ruling on that evidence.  In addition, resentencing counsel did not object to any of the serial-killer evidence presented by the Commonwealth at the resentencing hearing.  Nor, for that matter, did resentencing counsel object to the references that the prosecutor made to this evidence in her opening and closing statements to the jury.

We also will briefly address the PCRA court's observation that "resentencing counsel had thoroughly researched the issue and was unable to find any case law in support of his position."  (PCRA Court Opinion, 5/20/2024, at 13.)  At the May 14, 2021

---

serious provocation by . . . the individual killed."  18 Pa. C.S. § 2503(a)(1).  Smith's preferred reading material and his alleged desire to be a serial killer simply have no bearing on "the facts and circumstances" surrounding his guilty plea to voluntary manslaughter, as the evidence in no way relates to the elements of that crime.

evidentiary hearing, the following exchange took place between the prosecutor and resentencing counsel:

> [Commonwealth:] Now you argued, didn't you, you found [(*sic*)] the Supreme Court that the reading material was simply irrelevant and prejudicial as opposed to saying that it wasn't a fact and circumstance?
>
> [Counsel:] That's the argument I made.
>
> [Commonwealth:] Did you find any case law or support for that argument.
>
> [Counsel:] No. Case law was not on my side.

(N.T., 5/14/2021, at 43.)

Despite initially testifying that he did not find any case law to support the proposition that the reading-material evidence was irrelevant to the resentencing process, resentencing counsel then stated that case law was not on his side. Counsel, however, did not elucidate the case law upon which he relied to conclude that the reading-material evidence was relevant to Smith's resentencing hearing. Moreover, this testimony in no way addresses the admissibility of the serial-killer evidence. Simply put, resentencing counsel's testimony does not mitigate his failure to object properly to the evidence at issue.

### 3. Prejudice

As a threshold matter, we observe that the Commonwealth and, to some degree, the PCRA court have injected the harmless error doctrine into this PCRA litigation. We, however, highlight that a "harmless error" analysis becomes relevant in a direct appeal from a judgment of sentence when an appellant challenges evidence admitted by a trial court over the appellant's preserved objection. If an appellate court agrees with the appellant that the trial court erred in overruling the appellant's objection, the appellate court can nonetheless decide that no relief is due on the basis that the error was harmless. That process does not apply to the prejudice prong of the ineffective-assistance-of-counsel standard. Instead, a PCRA petitioner must establish

prejudice by proving that, but for counsel's action or inaction, there is a reasonable probability that the outcome of the proceeding would have been different. *See Commonwealth v. Spotz*, 84 A.3d 294, 315 (Pa. 2014) ("In light of the distinct review standards applicable to a preserved claim of trial court error versus a claim sounding in ineffective assistance of counsel under the PCRA, the Superior Court plainly erred in utilizing the 'harmless' error standard, rather than the higher [ineffective-assistance-of-counsel] 'prejudice' standard, which required [the petitioner] to show that his trial counsel's conduct had an actual adverse effect on the outcome of the proceedings.").

In applying the proper standard, we reiterate that: (1) the ultimate issue that the resentencing jury had to decide was whether to sentence Smith to death or life imprisonment, 42 Pa. C.S. § 9711(a)(1); and (2) to sentence Smith to death, the jury had to reach a unanimous decision that the aggravating circumstance outweighed the mitigating circumstances, 42 Pa. C.S. § 9711(c)(1)(iv). Consequently, as Smith emphasizes, to establish prejudice in this circumstance, Smith had to demonstrate that, but for resentencing counsel's failure to object properly to the reading-material and serial-killer evidence, there is a reasonable probability that one juror would have determined that the aggravating circumstance did not outweigh the mitigating circumstances. *See Wiggins*, 539 U.S. at 537 ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance. *Cf. Borchardt v. State*, . . . 786 A.2d 631, 660 ([Md.] 2001) (noting that as long as a single juror concludes that mitigating evidence outweighs aggravating evidence, the death penalty cannot be imposed)[.]").

Here, the presentation of the evidence at issue was not isolated or inconsequential. Rather, the Commonwealth referred to the evidence throughout a hearing that resulted in a sentence of death. Under these conditions, painting Smith as a serial-killer-in-training undermines confidence in the jury's sentence. We are compelled to conclude that, had counsel properly objected to the reading-material and serial-killer evidence, it is reasonably probable that at least one juror would have concluded that the aggravating circumstance did not outweigh the mitigating circumstances. Such a decision would have changed Smith's sentence from death to life imprisonment.

In reaching this conclusion, we reject the Commonwealth's argument that, because the jury in Smith's original trial did not hear the reading-material and serial-killer evidence but still sentenced him to death, Smith cannot establish that he was prejudiced by the presentation of that evidence to the jury in his resentencing hearing. Smith's two sentencing hearings are not comparable. Smith's first sentencing hearing took place in one day and was relatively short. Indeed, the transcript of the parties' evidentiary presentations spans a mere 39 pages. (N.T., 5/22/1995, at 38-77.)

For the Commonwealth's part, in addition to incorporating guilt-phase testimony and evidence into the penalty phase, the prosecutor only moved into evidence *via* stipulation a file which demonstrated that Smith pled guilty to voluntary manslaughter in 1980. (*Id.* at 38-41.) Smith began his presentation by incorporating some guilt-phase testimony into the penalty phase. This Court previously summarized the remainder of his evidence by explaining: "[Resentencing c]ounsel presented the testimony of [Smith's] mother and the case manager from a job training program [Smith] attended; the jury also heard Dr. [George] Woody's videotaped testimony." *Smith II*, 995 A.2d at 1149. Smith's mother testified briefly about Smith's character, his abusive childhood, and his drug use. (N.T., 5/22/1995, at 42-44.) Lynne Brown (Brown), Smith's job training case manager,

also testified briefly. Brown primarily recounted that, in the few months that she trained Smith, he was working on his drug problem. (*Id.* at 44-51.) Dr. Woody is a psychiatrist. In terms of his substantive testimony, the doctor generally testified about the effects of cocaine use on humans. (*Id.* at 60-77.) As explained above, this Court in *Smith II* determined that Smith's original sentencing counsel rendered ineffective assistance during this hearing by failing "to pursue all reasonable avenues for developing mitigation evidence." *Smith II*, 995 A.2d at 1172.

In stark contrast to Smith's original penalty-phase hearing, the parties' evidentiary presentations at his resentencing hearing took place over four days from June 18th to June 21st of 2012, and the transcript of that hearing spans hundreds of pages. Although we need not summarize all of the parties' evidence, we note that, unlike in Smith's original sentencing hearing, the Commonwealth presented the testimony of multiple witnesses, including Rollins, Jeffery, and Detective Peifer. Smith, on the other hand, elicited testimony from many witnesses and laid out a robust case in support of the mitigating factors that he was attempting to prove. Of further significance, after deliberating for some time, the resentencing jury informed the trial court that it was "unable to reach a unanimous verdict." (N.T., 5/22/2012, at 34-35.) Over Smith's objection, the trial court instructed the jury to continue to deliberate. (*Id.* at 38-39.) The jury subsequently sentenced Smith to death.

If anything, this series of events bolsters our conclusion that Smith has established the prejudice prong of the ineffective-assistance-of-counsel standard. After hearing the parties' evidence, the resentencing jury initially was unable to reach a unanimous verdict. While the jury ultimately returned a unanimous decision in favor of a death sentence, there is a reasonable probability that, but for resentencing counsel's failure to object properly to the reading-material and serial-killer evidence, there is a reasonable

probability that the outcome of the resentencing hearing would have resulted in a sentence of life in prison.

## V. CONCLUSION

For the reasons detailed above, we hold that the PCRA court erred by dismissing Smith's claim that resentencing counsel rendered ineffective assistance by failing to object properly to the admissibility of the reading-material and serial-killer evidence. We, therefore, reverse the PCRA court's order. In addition, we remand the matter to the PCRA court with the direction to enter an order granting Smith a new penalty-phase hearing.

Chief Justice Todd and Justices Donohue, Dougherty, Wecht, Mundy, and McCaffery join the opinion.